Michael J. DeBenedictis (MD 8048)
DeBenedictis & DeBenedictis LLC
41 S. Haddon Ave., Suite No. 5
Haddonfield, NJ 08033
(856) 795-2101
mjd@debenedictislaw.com

Ann Miller (AM 5463)
Ann Miller LLC
834 Chestnut Street, Suite 206
Philadelphia, PA 19107
(215) 238-0468
am@attorneyannmiller.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **S.L. LERNER**, individually and derivatively on behalf of **COMMERCE BANCORP, INC.**<br><br>Plaintiff,<br><br>v.<br><br>**VERNON W. HILL, II; JACK R. BERSHAD; JOSEPH BUCKELEW; DONALD T. DI FRANCESCO; MORTON N. KERR; STEVEN M. LEWIS; JOHN K. LLOYD; GEORGE E. NORCROSS, III; DANIEL J. RAGONE; WILLIAM A. SCHWARTZ; JOSEPH T. TARQUINI; JOSEPH S. VASSALLUZZO;**<br><br>Defendants,<br><br>-and-<br><br>**COMMERCE BANCORP, INC.,**<br><br>Nominal Defendant. | CASE NO.:<br><br><br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

1.      Plaintiff, S.L. Lerner, ("Plaintiff"), by his undersigned counsel, brings the following Complaint upon knowledge as to his personal circumstances and, as to all other

matters, upon the investigation made by and through his counsel, against Vernon W. Hill, II, Jack R. Bershad, Joseph Buckelew, Donald T. Di Francesco, Morton N. Kerr, Steven M. Lewis, John K. Lloyd, George E. Norcross, III, Daniel J. Ragone, William A. Schwartz, Joseph T. Tarquini, Joseph S. Vassalluzzo, and Commerce Bancorp, Inc. ("Commerce" or the "Company"), the parent of Commerce Bank, N.A. (the "Bank"). Commerce is a Nominal Defendant herein and no monetary claims have been asserted against it. The investigation by plaintiff's counsel included a review of Commerce's filings with the Securities and Exchange Commission ("SEC"), reviews of the Company's website, press releases issued and other public statements made by the Company, interviews of knowledgeable persons, actions taken in response to written demands served upon Commerce's Board of Directors and upon Commerce directly, securities analysts' reports and advisories about the Company, and news articles, and other reports concerning Commerce and other companies with which members of Commerce's Board of Directors were or are affiliated.

## COMMERCE AND ITS GROWTH

2. Commerce has evolved into a regional financial services leader anchored by its bank subsidiaries (principally the Bank) and augmented by Commerce Banc Insurance Services, Inc. ("CBIS"), and Commerce Capital Markets, Inc. ("CCM"). Founded in 1973, the Company's first 33 years have been marked by rapid growth.

3. With assets in excess of $43 billion, the Bank is the largest bank headquartered in Southern New Jersey, serving Metropolitan Philadelphia, New Jersey, Delaware, Virginia, Washington, DC, Connecticut, Florida and New York. Among the Company's subsidiaries, CCM is the region's largest public finance underwriter and provides financial advisory services to major clients in the field of education and healthcare. Commerce has stated that it plans to continue its growth and reinforce its brand by increasing its 400+ branch offices of the Bank in its present and other market areas. According to the Company's website, the Bank's retail approach to banking uses a chain concept and features standardized facilities, standardized hours, standardized service and aggressive marketing.

4.     The cornerstones of Commerce's profitability have been its high level of core deposits at the Bank which have been generated in part by the relentless expansion of its branch network.

5.     For many years, the public image of Commerce and its Board has deteriorated as a result of exposure of certain of the questionable business dealings of the Bank, CCM and CSIS as well as those of certain of Commerce's directors. In part, to burnish its corporate image, the Board, on December 19, 2006, in anticipation of the announcement of certain investigations by federal banking regulators referred to below, approved three documents which set forth what the Board wanted the public to think were Commerce's business conduct (the "Governance Codes"):

***"Code of Business Conduct and Ethics"***   (hereinafter "Code") states the following:

a)   "Our Code is rooted in core Commerce principles:  integrity, service, and value.  It seeks to promote a culture of legal, regulatory and ethical compliance, guide behavior to maintain public trust and confidence, and expand our reputation as a good corporate citizen." (pg. 1).

b)   "The basic principles at the heart of our Code are . . . Avoid[ing] conflicts of interest between personal affairs and Commerce's interests."  (pg. 2).

c)   "Team Members and Directors are expected to act in Commerce's best interests and to avoid conflicts of interest.  Actions or transactions that involve a conflict of interest are strictly prohibited.  Even the appearance of conflict can hurt the Commerce brand and reputation."  (pg. 7).

d)   "Conflicts of interest arise in many ways.  Some examples include when there is a substantial risk that Team Members or Directors will . . . Receive material, improper personal benefits as a result of their actions or position at Commerce.  Misuse Commerce resources for personal gain.  Take for personal benefit an opportunity discovered through Commerce's information or property."  (pg. 7).

e)   "As we build and improve our legendary Commerce brand, Team Members and Directors have a duty to advance the Company's legitimate interest when opportunities arise.  Do not:  Take for yourself personally any opportunities that arise or are discovered through the use of Commerce information, property, technology resources, or position; Use Commerce information, property, technology resources, or position for personal gain; and Directly or indirectly compete with Commerce." (pg. 8).

f)   "Outside activities, while encouraged, must never interfere with the proper performance of Commerce duties or create a conflict of interest with Commerce.  Specifically, outside activities ***must not***:  Compete with Commerce; Damage Commerce's reputation; Interfere with Commerce's business; or Be prohibited by law, regulation or any of Commerce policies." (pg. 13) (emphasis in original).

3

g) "Exercise caution because even appearances of conflicts can hurt our brand and reputation for integrity." (pg. 13).

**"_Corporate Governance Guidelines_"** states the following:

a) "In addition to its general oversight of management, the Board and its committees also perform a number of specific functions, including: . . . Ensuring processes are in place for maintaining the integrity of [Commerce], the integrity of the Company's financial statements, the integrity of compliance with law and ethical business practices, the integrity of relationships with customers and suppliers, and the integrity of relationships with other stakeholders."  (pg. 1-2).

b) "Commerce directors should possess the highest personal and professional ethics, integrity and values, and be committed to representing the long-term interests of Commerce's shareholders."  (pg. 2).

c) "The Board expects its directors, as well as employees, to act ethically at all times and to acknowledge their adherence to the codes comprising Commerce's Code of Business Conduct and Ethics and, to the extent applicable, Commerce's Code of Ethics for Senior Financial Officers. . . . If an actual or potential conflict of interest arises for a director, the director will promptly inform the President.  Al directors must recuse themselves from any discussion or decision affecting their personal, business or professional interests." (pg. 5-6).

**"_Code of Ethics for Senior Financial Officers_"** states the following:

a) "Senior Financial Officers are expected to act at all times in the best interest of the Company." (pg. 1).

b) "A conflict of interest exists when your personal interest interfere with, or give the appearance of interfering with, the interests of [Commerce].  In the best interests of [Commerce], including gaining improper personal benefits as a result of your position.  In addition, you should not use corporate assets or information for your personal gain." (pg. 2).

c) "Conflicts of interest may manifest themselves in many ways and may reach farther than just the person employed by the Company.  In fact, conflicts may arise as a result of situations involving relatives." (pg. 2).

6.    As described below, Commerce's business model has been badly flawed by acting contrary to Commerce's Governance Codes as set forth above. In particular, in part as reflected below, the directors of Commerce have intertwined business, social and other dealings with one another which, because of such relationships, cause them to "look the other way" when there is actual or perceived wrongdoing of their fellow directors, senior officers of the Company and their respective relatives and affiliates.

7.     As described below, acting contrary to Commerce's Governance Codes as set forth above, defendant Vernon W. Hill, II ("Hill") has engaged in transactions for his personal benefit and the benefit of his family at the expenses of Commerce, resulting in regulatory investigations of the Company, which expose the Company to costs and the loss of goodwill.  In contravention of the Company's stated guidelines, Hill and the directors of Commerce have intertwined business, social and other dealings with one another.  Because of such relationships, Hill was able to engage in these self-interested dealings with the Company without other members of the Board enforcing strict compliance with the Company's own rules.

## NATURE OF THE ACTION

8.     This is a suit to vindicate plaintiff's rights as a shareholder of Commerce against defendants arising out of the preparation, issuance and dissemination of the Company's 2007 Proxy Statement by and on behalf of its Board of Directors which Proxy Statement is false, misleading and in violation of § 14(a) of the Exchange Act and Rule 14(a)-9 promulgated thereunder by the SEC and as a stockholder's derivative action pursuant to Rule 23.1 of the Federal Rules of Civil Procedure as well as for specified books and records under and pursuant to §14A:5-28 of the New Jersey Business Corporation Law, under common law principles, on behalf of Nominal Defendant Commerce, against Hill and the other defendants for breaches of fiduciary duty,  including the duties of good faith, loyalty and full disclosure, gross mismanagement, waste of corporate assets and abuse of control.  On behalf of Commerce, plaintiff seeks to recover the damages caused to it by the defendants and to cause them to account for and re-pay the Company for their unjust enrichment. Plaintiff also seeks by this suit injunctive relief to require the Company, by Order of the Court, to change its actual corporate governance so as to prevent a recurrence of the wrongdoing described herein and to cause the reconstitution of the Board so that the Company is truly under the control of disinterested and independent directors. Plaintiff also seeks injunctive relief which provides to him access to the books and records of Commerce as requested by plaintiff, through his counsel, in a letter addressed to Commerce's Board of Directors and to its Corporate Secretary on March 20, 2007

which request was effectively rejected despite plaintiff's entitlement.

9.      During at least the past six years, all of the named directors, former directors and certain of the senior officers of Commerce intentionally breached their fiduciary duties of care, loyalty and full disclosure by grossly mismanaging Commerce, wasting its assets, permitting its improper diversion of corporate assets improperly to friends, business associates and family members, as well as family trusts and businesses controlled by defendant Hill as more specifically set forth below.

10.      Buried in an earnings release of January 16, 2007, the Company disclosed:

> "Commerce has been advised that an investigation is being conducted by the Office of the Comptroller of the Currency ("OCC"), in conjunction with the Board of Governors of the Federal Reserve System ("FED"). Commerce has further been advised that the scope of the investigation will include but not be limited to transactions with its officers, directors and related parties, including transactions involving bank premises. Commerce is fully cooperating with the OCC and the Federal Reserve with respect to the investigation."

11.      Thereafter, on June 28, 2007, the Bank entered into a Consent Order with the OCC ("Consent Order") which relates to, *inter alia*, corporate governance, related party transactions and policies and procedures at Commerce Bank and at the corporate level at Commerce including, specifically, certain of the conduct referred to herein.

12.      Certain of the schemes and transactions that were under investigation by federal banking regulators and subject to the Consent Order as well as all of the conduct described in this Complaint were directed or approved by Hill with the active participation and/or acquiescence of each of the other directors of Commerce, all of whom knew or should have known that much of the Company's growth in retail branches was accompanied by self-dealing by Hill with members of his family, corporations controlled by them including InterArch, Inc. ("InterArch"), Interstate Commercial Real Estate, Inc. ("ICRE"), Galloway National Golf Club, Inc. ("Galloway") and

Markeim-Chalmers, Inc. ("MCI") and others.  The self-dealing includes, *inter alia,* charging excessive rents to Commerce for the rental of company facilities including Bank branches through Hill family-controlled trusts and partnerships and by paying InterArch, ICRE, Galloway and other companies owned or controlled by Hill and his wife more than $72 million in purported consulting, design and related fees and expenses, a significant portion of which was excessive, unjustified and/or otherwise wasteful of Commerce's assets. In particular, given the admitted standardized nature of Bank branches and the uniformity of design therein, the Bank should have sought bidding upon contracts with architects, designers and others who provided professional services for Commerce and its subsidiaries, but did not do so.

13.     The directors of Commerce, including more recently-appointed directors, John K. Lloyd ("Lloyd") and Joseph S. Vassalluzzo ("Vassalluzzo"), members of a so-called Special Committee of purportedly independent members of Commerce's Board, have perpetuated the cover up of their breaches of fiduciary duty and those of others having such duty to Commerce by failing to timely cause the Company to sue the defendants to recover its damages or even attempting to cause the defendants to discontinue their improper looting of Commerce and the other conduct more specifically referred to in a letter sent by counsel on behalf of plaintiff dated March 20, 2007 addressed to Commerce's Board of Directors  as described herein ("Plaintiff's Demand Letter").

14.     Commerce's directors have, for many years, in exchange for the perquisites of office, abdicated their fiduciary duties to Commerce and its shareholders by "looking the other way" insofar as Hill's conduct and that of his family was concerned as well as the other actions taken by and for Commerce and the Bank at the behest of Hill.  Indeed, Commerce's Board caused the formation of a so-called Special Committee of defendants Lloyd and Vassalluzzo,

purportedly to investigate, *inter alia*, only a small segment of the wrongdoing alleged herein but who, on information and belief, are carrying out a scheme to "whitewash" the wrongful conduct of the defendants as well as all members of Commerce's Board and attempted to insulate the defendants and their confederates from liability to Commerce.

15.     Despite their longstanding knowledge of the wrongdoing alleged herein, the directors of Commerce, by forming the new Special Committee, are engaging in a further corporate sham, and are unable or unwilling to exercise disinterested business judgment to protect and prosecute the interests of Commerce and the shareholders who own the Company. Further, given their ties and business obligations to Hill, the Special Committee members, defendants Lloyd and Vassalluzzo, who could not have functioned objectively in any event, are abdicating their responsibilities to Commerce by failing to cause the Company to take any action against the defendants who have enriched Hill and his confederates unjustly at the Company's expense.

16.     In connection therewith, in furtherance of their efforts to insulate the defendants from liability for the wrongdoing alleged herein, defendants Lloyd, Vassalluzzo and their counsel caused and are causing Commerce to waste further corporate funds on legal fees, expenses and other charges related to such "investigation" and the functioning of the Special Committee and may well use its existence and purported business judgment as a pretext to seek the dismissal of this and any other similar litigation commenced by the Company's shareholders. Further, defendants Lloyd and Vassalluzzo have narrowly defined the mission of the Special Committee to exclude from consideration much of the wrongdoing set forth in Plaintiff's Demand Letter.

17.     The practices of defendants as described above, as well as others presently unknown to plaintiff, were approved either tacitly or affirmatively by all of Commerce's

directors. As a result of the conduct of the defendants as set forth in this Complaint, Commerce has sustained substantial damages in an amount which cannot be calculated at present. This action seeks, *inter alia*, such damages from the defendants named herein, the access to the books and records sought by plaintiff as well as the injunctive relief sought by this action in the Prayer for Relief set forth below.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. § 1331 because plaintiff asserts claims for violations of § 14(a) of the Exchange Act and SEC Rule 14(a)-9 and under and pursuant to 28 U.S.C. § 1367(a) for plaintiff's state law claims.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Commerce has its corporate headquarters and principal place of business in this District, most of the defendants reside and/or do business in this District and most of the wrongful acts alleged herein took place and/or were initiated by defendants in this District, including the preparation and dissemination of the materially false and misleading Proxy Statement.

20.    In connection with the acts alleged in this Complaint, defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails and interstate wire facilities, to carry out the wrongdoing.

## PARTIES

21.    Plaintiff S. L. Lerner, a citizen of the State of New Jersey, is and has been the owner of Commerce common stock continuously and at all times relevant to this action.

22.    Nominal Defendant Commerce is a New Jersey corporation with its principal executive offices located at Commerce Atrium, 1701 Route 70 East, Cherry Hill, New Jersey

08034-5400. No financial claims are asserted in this litigation against Commerce; rather, this litigation was commenced for its benefit and on its behalf.

23.     Defendant Vernon W. Hill is a citizen of the State of New Jersey and, until the Consent Order, served as Chairman of the Board and President of Commerce.

24.     Defendants Bershad, Lloyd, Vassalluzzo, Joseph Buckelew ("Buckelew"), Donald Di Francesco ("Di Francesco"), Morton N. Kerr ("Kerr"), Steven M. Lewis ("Lewis"), George E. Norcross, III ("Norcross"), Daniel J. Ragone ("Ragone"), William A. Schwartz, Jr. ("Schwartz") and Joseph Tarquini, Jr.   ("Tarquini") have each served as directors of Commerce and each explicitly approved and/or participated directly in the wrongdoing described in this Complaint.

25.     The members of Commerce's Board of Directors are or were during relevant times:

(a)  Hill, a director of the Bank since 1973 and Commerce since 1982, has been Chairman, President and/or Chief Executive Officer of Commerce since 1973 and Chairman, President and/or Chief Executive Officer of the Bank since 1982.  Hill has been Chairman of Commerce North since January 1997.  Hill was forced to resign from such positions with Commerce and the Bank pursuant to the Consent Order and otherwise on June 28, 2007. His conduct and that of others named herein as defendants is believed to be under investigation by the OCC, the FED and the SEC.

(b) Defendant Bershad, a director of the Bank and Commerce since 1987, is a retired partner of the law firm of Blank Rome LLP, Philadelphia, Pennsylvania and Cherry Hill, New Jersey, and was a partner in such firm from 1964 to 2002.  Upon information and belief, he was or is counsel to the Company and at least certain of the defendants.

(c) Defendant Buckelew has been a director of Commerce since November 1996 and

the Bank since June 1997, has been Vice Chairman of Commerce Insurance Services, Inc. since November 2000. Buckelew was Chairman of Commerce Insurance Services, Inc. from November 1996 through November 2000. Buckelew is also the Chairman of the New Jersey Sports and Exposition Authority and the former Chairman of the New Jersey Highway Authority and the Ocean County, New Jersey GOP.

(d) Defendant Di Francesco has been a director of Commerce and the Bank since March 2002, was the Governor of New Jersey from January 31, 2001 through January 8, 2002, served as the President of the New Jersey Senate from 1992 through January 31, 2001 and has been a partner in the law firm of Di Francesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, P.C., Warren, New Jersey, from 1992 through January 31, 2001 and from January 8, 2002 to the present. Upon information and belief, Di Francesco and his firm receive legal fees from Commerce, which fees are directed by defendant Vernon.

(e) Defendant Kerr has been a director of the Bank since 1973 and Commerce since 1982, has been Chairman of defendant MCI, a real estate and related appraisal company. Commerce and the Hill family have had and, upon information and belief, continue to have, business dealings with defendants MCI and Kerr. During times relevant herein, defendants Hill and Kerr are believed to have controlled MCI and caused it to provide, *inter alia*, appraisals made as instructed by defendants Hill and Kerr.

(f) Defendant Lewis has been a director of Commerce and the Bank since 1988, has been President of U.S. Restaurants, Inc., Blue Bell, Pennsylvania, since 1985 and President of S. J. Dining, Inc., Blue Bell, Pennsylvania, since 1986.

(g) Defendant Lloyd has been a director of Commerce and the Bank since October 2004, has been President and CEO of Meridian Health, a leading integrated health system, since

1997.  Defendant Lloyd was the President and CEO of Jersey Shore Medical Center from 1992 to 1997.  Hill caused defendant Lloyd to be appointed to the newly-formed Special Committee.

(h) Defendant Norcross has been a director of Commerce and the Bank since March 2002, has been Chairman and Chief Executive Officer of Commerce Insurance Services, Inc. since November 2000.  Norcross was the President and Chief Executive Officer of Commerce Insurance Services, Inc. from November 1996 through November 2000. Before such time, he had (and is believed to still have) numerous business relationships with Hill and his wife Shirley Hill and members of their family.  Hill and Norcross are believed to have engaged in transactions on behalf of Commerce and the Bank with Donald J. Trump pursuant to which they obtained, for themselves and their personal use, memberships in Trump's Mar-a-Lago private club in Palm Beach, Florida and at one or more of Trump's members-only golf courses including the Trump International Golf Course in West Palm Beach, Florida.

(i) Defendant Ragone has been a director of the Bank since 1981 and Commerce since 1982, was the former Chairman and/or President of Ragone, Raible, Lacatena & Beppel, C.P.A., Haddonfield, New Jersey, and its predecessor firms from 1960 to 1996.  Ragone is chairman of the Audit Committee. Upon information and belief, Ragone and his firm are paid fees by and have other business relationships with defendants.

(j) Defendant Schwartz has been a director of the Bank and Commerce  since June 1997, has been Chairman, President and Chief Executive Officer of U.S. Vision, Inc. ("USVI"), Glendora, New Jersey, an optical retailer, and its predecessor firms, since 1967.   Defendant caused the Bank to use its funds to buy, together with others, USVI for $32.5 million and used nearly $1 million of the proceeds of the loans to purchase certain property USVI had been leasing from Optical Equities, a joint venture between defendants Hill and Schwartz. The purchasers of

USVI included defendant Norcross, a director of Commerce. In connection with these transactions, Hill is believed to have charged USVI at least $280,000 for purported financial advice. Defendant Schwartz is also a director of Mothers Work, Inc.

(k) Defendant Tarquini has been a director of the Bank since 1973 and Commerce since 1982, was the Chairman and/or President of The Tarquini Organization, A.I.A., Camden, New Jersey, from 1980 to 2000. Tarquini is a member of the Audit Committee.

(l) Defendant Vassaluzzo has been a director of the Bank and Commerce since May 2005, was the Vice Chairman of Staples, Inc., Framingham, Massachusetts from 2000 to 2005. Mr. Vassalluzzo is also a director of iParty Corporation, Life Time Fitness, Inc. and Federal Realty Investment Trust. Defendant Vassalluzzo is a member of the Audit Committee and is the chairman of the Special Committee. Defendant Hill caused defendant Vassalluzzo to be appointed to the newly-formed Special Committee.

## DEMAND ALLEGATIONS

26.     On March 20, 2007, plaintiff made a formal demand on Commerce's Board of Directors to commence litigation against each of them and their attorneys, accountants and others responsible for the Company's damages as of that date.  The Directors of Commerce have never taken any meaningful action on that Demand and their repeated unwillingness to do so constitutes a wrongful refusal to carry out the actions demanded by plaintiff.  Moreover, their replacement of Hill as Chairman by three individuals, all of whom owe their positions at the Bank to Hill and who are thus beholden to him, makes it highly unlikely that the Board will take any meaningful action on plaintiff's demand in the near future.

27.     In practical terms, as reflected by the Board's reaction to Plaintiff's Demand Letter, any similar demand by plaintiff herein would be and has been a futile gesture since

Commerce's Board would not cause the Company to sue Hill, his family members or their confederates or sue the directors themselves and a suit by Commerce against Hill or any of Commerce's present or former directors would eliminate any ability of the Company to recover the proceeds of the various officers' and directors' liability insurance coverage, which Commerce purchased for its own benefit. Further, each member of the Commerce Board, including defendants Lloyd and Vassalluzzo, owes his position and corporate emoluments to Hill's control over all of the Company's directors. Indeed, Hill caused each such director, either directly or through other directors controlled by him, to appoint, nominate and/or re-nominate every one of Commerce's directors, who are thus beholden to him and to each other.

28.     The actions and failures to act by the members of Commerce's Board amount to a waste of corporate assets.  Such waste of assets cannot be blessed by Commerce's Board or by any committee thereof including the Special Committee and, as such, these activities are not capable of ratification in the context of either "investigating" the defendants' wrongdoing and/or deciding what the appropriate course of action is with respect to any derivative litigation filed without shareholder demands upon Commerce's Board.

29.     For the foregoing reasons, Commerce's Board has relinquished any right to exercise the business judgment normally accorded to a board of directors and this litigation should be allowed to proceed on behalf of the Company and for its benefit.

30.     It is clear that the Board has taken no substantive action in response to Plaintiff's Demand Letter and, as such, it is deemed rejected. The Commerce Board has continually demonstrated a conscious disregard for the interests of the Company's stockholders and has shown a gross unwillingness to protect Commerce's interests by recovering monies from its culpable directors and others and, in particular, Hill, members of his family and entities

controlled by them or taking other action to protect Commerce and the Bank from the wrongful conduct described herein.

31.     Commerce's Board of Directors did not exercise independence in evaluating Plaintiff's Demand Letter to institute suit on behalf of the Commerce because their own defense to such a suit would be a concession that the Board was unaware of the goings on at Commerce, which alone establishes a gross breach of fiduciary duty and/or an active participation in such wrongdoing as alleged herein. The authorization of a suit which Commerce's Board members know would require an ignorance defense would not be logical given the risks such an admission would have on their suitability to serve on other corporate boards or to engage in other activities requiring the exercise of fiduciary responsibilities and would taint their ongoing and future stewardship of Commerce.

32.     Commerce's directors are also unwilling to authorize a lawsuit such as this because it would be tantamount to self-incrimination. Further, as alleged above, the directors of Commerce have inter-twining business and other relationships which render them not independent to one another or to Hill, who caused the appointment of each of the directors to the Board and, indirectly, to the Special Committee. The directors' relationships to one another known to plaintiff include:

> a)  In 2001, Hill donated $100,000 to Monmouth University for a scholarship fund to be named after defendant Buckelew;
>
> b)  Hill is a former partner in Optical Equities with defendant Schwartz;
>
> c)  Hill was a business partner with defendant Norcross in the development of Galloway.  During 2005, the Company utilized the facilities of Galloway and paid it unjustly approximately $482,000 and in total, over the years, well in excess of $1 million;
>
> d)  A limited partnership, partially comprised of Hill, Bershad and Lewis and

a corporation owned by Hill, leased land to Commerce prior to 2002.  In the first quarter of 2002, the Commerce purchased all of the partnership interests;

e) At one time, a firm formerly owned by defendant Buckelew employed the wife of defendant DiFrancesco as a part-time insurance broker;

f) Defendant Kerr is the former chairman of defendant MCI, which in 2001 received approximately $235,000 in fees for real estate related services from the Commerce.  At least on paper, defendant Kerr appears to have resigned and divested his interest in MCI;

g) The law firms of defendants Bershad and Di Francesco previously did business with Commerce and are believed to have provided free or reduced-fee services to defendant Hill and entities controlled by him and/or his family;

h) In 2002, Board approved a $32.5 million line of credit for defendants Norcross, Schwartz and others to buy control of USVI; and

i) Defendant Norcross is the Chairman of the Board of Trustees of Cooper University Hospital, of which defendant Schwartz is also a member of the Board.

33.    Given the Board's obvious conflicts of interest, there never is or was any likelihood that the Board would authorize an action against the defendants. The other Commerce directors all have direct and/or indirect personal and professional relationships with Hill that clearly prevent them from exercising sound judgment as to the merits of a suit by Commerce against Hill, his family members and other persons and entities who have improperly and unjustly profited from their dealings with Commerce and the Bank.

34.    Given the intermisticity of relationships of Commerce's Board members and the level of recklessness shown by them in the purported discharge of their duties as members of the Board or as committee chairs, it would be futile to expect any legitimate action against the defendants to be forthcoming from the Board of Directors to protect the interests of the Company and its shareholders.

## COUNT I

## FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT

35.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.  This claim asserted by plaintiff individually and derivatively on behalf of Commerce against the Individual Defendants who were members of Commerce's Board of Directors when the 2007 Proxy Statement was issued.

36.     This claim is asserted against those members of the Company's Board of Directors for violations of Section 14(a) of the Exchange Act and SEC Rule 14(a)-9 as controlling persons of Commerce in connection with the Company's Proxy Statement disseminated on behalf of the Board of Directors on April 12, 2007 in connection with the Company's Annual Meeting of Shareholders scheduled and held May 15, 2007 (the "2007 Proxy Statement").

37.     The 2007 Proxy Statement solicited the votes of plaintiff and the other Commerce shareholders in connection with, *inter alia*, the re-election of certain of the sitting directors and recommended that they be retained.

38.     The 2007 Proxy Statement described certain Related Party Transactions including, but not limited to the following:

> Bancorp has nineteen operating leases, entered into during 2002 and prior, for land and bank premises with limited partnerships in which Mr. Hill is a partner or in which a corporation owned by Mr. Hill is a partner, or from the Hill Family Trust.  The aggregate annual rents under these leases for 2006 was approximately $1.9 million.  These leases expire periodically beginning in 2008 but are renewable through 2042.  In addition, Bancorp has three operating land leases, entered into during 2004 and prior, with partnerships partially owned by family members of Mr. Hill.  Two of the leases are with partnerships 30% owned by a brother of Mr. Hill.  The other lease is with a partnership 30% owned by a son of Mr. Hill.

The aggregate rents under these leases for 2006 was approximately $372,000. These leases expire between 2019 and 2024 but are renewable through 2044.

Management believes that the rents paid for each of the foregoing leases is and was comparable to the rents that would have been paid to non-affiliated parties in similar commercial transactions for similar locations, assuming that such locations were available.

During 2006, Bancorp obtained appraisal services from Markeim Chalmers Appraisals, an appraisal company whose president and 50% owner is a son-in-law of Mr. Kerr, director of Commerce Bancorp and Commerce NA. Bancorp paid approximately $119,000 to this firm in 2006. The Board did not approve services provided by this company. Management believes amounts paid in 2006 were substantially equivalent to those that would have been paid to an unaffiliated company for the performance of similar services.

During 2006, Bancorp utilized Interstate Commercial Real Estate, Inc. ("Interstate Commercial"), a commercial real estate development company/broker for all of its real estate transactions. Interstate Commercial received commissions paid by the seller for such services in 2006. A brother and son of Mr. Hill are executive officers and commissioned employees of Interstate Commercial. Based on information provided by Interstate Commercial, Mr. Hill's brother and son earned commissions from sellers of approximately $770,000 and $350,000, respectively, during 2006. Management believes seller commissions earned by Interstate Commercial were substantially equivalent to those that would have been earned by unaffiliated companies for the performance of similar services.

Bancorp obtained architectural design and facilities management services from InterArch, Inc., a business owned by the wife of Mr. Hill. Bancorp spent $9.2 million in 2006 for such services and related costs. Management believes these disbursements were substantially equivalent to those that would have been paid to unaffiliated companies for similar services.

During 2006, Bancorp and its subsidiaries utilized the facilities of Galloway National Golf Club for the purpose of business development. Bancorp paid approximately $643,000 in 2006 for the use of those facilities. Mr. Hill is a principal equity holder, and Messrs. Norcross and Lewis each are equity holders, of Galloway

National Golf Club.  Management believes such expenses were substantially equivalent to those that would have been paid to unaffiliated companies for utilization of similar facilities.

39.     The 2007 Proxy Statement contained written statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts.  Specifically, the 2007 Proxy Statement failed to disclose that the existing contracts and agreements with entities owned and/or controlled by Hill and his family and InterArch, Inc. require the Bank to pay to these companies amounts which are far in excess of the market value for these goods and services and that these contracts were the subject of regulatory investigations by, *inter alia*, the OCC.  The 2007 Proxy Statement also failed to disclose that the operating leases for land and premises with limited partnerships in which defendant Hill is a partner or in which a corporation owned by Hill is a partner or for the Hill Family Trust charge rents which are excessive and are not at fair market value and that these leases are the subject of regulatory investigations by, *inter alia*, the OCC.  The 2007 Proxy Statement also fails to disclose that the services purchased from Markheim Chalmers Appraisals were purchased for prices which are substantially in excess of the fair market value for such services and that the fees paid to Galloway National Golf Club were materially in excess of the going market rate for such fees.  The 2007 Proxy Statement also failed to disclose that as of the date the Proxy Statement was issued all of the related party transactions described therein were the subject of regulatory investigations and shareholders' litigation.

40.     These facts were know to the Board of Directors prior to and/or at the time of the mailing of the 2007 proxy solicitation.  Specifically, *inter alia*, at some time prior to the January 16th, 2007 earning release, the Board of Directors had actual knowledge of the substance of the regulatory investigation described above and that the related party transactions referenced in the

2007 Proxy Statement were included within the scope of that regulatory investigation. Further, not only did the board of directors have actual knowledge of the existence of, the scope of, and the actual particulars of the transactions involved with the regulatory investigation, as of the date the Proxy Statement was issued the members of the Board of Directors were actual parties to shareholder litigation regarding all of the related party transactions described therein.

41.     As a result of the use by the Company's Board of Directors of the 2007 Proxy Statement to solicit votes of Commerce shareholders which Proxy Statement failed to disclose the material facts set forth herein, the Board's nominees and proposals were approved. By utilizing such Proxy Statement the suffrage rights of plaintiff and each other shareholder of the Company have been violated, which conduct is in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 and by having the Director supported nominees re-elected, Commerce has been and continues to be damaged.

## COUNT II

## BREACH OF FIDUCIARY

42.     Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

43.     By reason of their positions and ability to control the business and corporate affairs of Commerce, at all relevant times, defendants individually and collectively, owed the Company and its shareholders fiduciary duties of loyalty, due care and full disclosure and were required to operate Commerce and conduct its business affairs in a fair, just and equitable manner and to act in furtherance of the best interests of Commerce and its shareholders.

44.     Defendants owed Commerce and its shareholders a fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the

use and preservation of its property and assets.

45.     Defendants owed Commerce and its shareholders a fiduciary duty to insure that Commerce operated in compliance with all applicable federal and state laws, rules and regulations, that Commerce did not engage in improper or illegal transactions with the defendants and their controlled entities, and that it did not waste its corporate assets.

46.     To discharge their fiduciary duties, Hill and the other members of the Board were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of Commerce. Among other things, they were and are required to:

    a.     manage, conduct, supervise and direct the employees, business and affairs of Commerce in accordance with applicable laws, rules and regulations;

    b.     not violate or permit any officer, director or employee of Commerce to violate applicable laws, rules and regulations;

    c.     exercise reasonable control and supervision over Commerce's officers and employees and the contracts entered into in the name of Commerce;

    d.     insure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Commerce and its officers and employees;

    e.     remain informed as to how Commerce was, in fact, operating, and, upon receiving notice or information of unsafe, imprudent or unsound practices, make reasonable investigation of such practices and take steps to correct such practices;

    f.     supervise the accurate and complete preparation, filing and dissemination of any SEC filings, press releases, audits, reports or other information disseminated by Commerce;

    g.     maintain and implement an adequate system of internal controls at

Commerce, including financial, accounting and management information systems to protect against, *inter alia*, self-dealing on the part of officers and directors;

h.    supervise the preparation and filing of any audits, reports or other information disseminated by Commerce to make full and accurate disclosure of all material facts to banking regulators, the SEC and the Company's shareholders including the extent and nature of the dealings between Commerce, the defendants and their controlled entities; and

i.    preserve and enhance Commerce's reputation as a public corporation and maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

47.    As described above, defendants breached their fiduciary duties to protect the rights and interests of Commerce and its shareholders.

48.    As described above, defendants failed in their fiduciary duties to Commerce and its shareholders to prudently supervise, manage and control the Company's operations and prudently manage its business and assets.

49.    By subjecting Commerce to the unreasonable risk of substantial damages and by failing responsibly and with due care to oversee and implement proper management and accounting, leasing and business contracting practices at Commerce, defendants breached their duties of due care and diligence in the management and administration of the Company's affairs and in the use and preservation of its assets.

50.    During the course of the purported discharge of their duties, all of Commerce's directors knew the unreasonable risks associated with the wrongful conduct described in this Complaint, and either participated in or approved those activities or failed to supervise such activities in accordance with their duties to both Commerce and its shareholders.  As a result,

defendants grossly mismanaged Commerce and engaged in self-dealing with respect to its assets.

51.    As a proximate result of the breaches of fiduciary duties by Hill and the other directors of Commerce, Commerce has been damaged and will continue to suffer damages in an amount that is presently incapable of determination by plaintiff.  Among other things, as a result of the regulatory investigations into Hill's conduct the Bank has not been permitted to open new branches for a significant length of time and thus has not been able to continue operations in accordance with the business model that has heretofore brought it such success.

## COUNT III

## WASTE OF CORPRORATE ASSETS BY DEFENDANT VERNON AND THE MEMBERS OF COMMERCE'S BOARD OF DIRECTORS

52.    Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

53.    Defendants owe and owed to Commerce the obligation to protect its assets from undue loss or waste.

54.    Hill and each member of Commerce's Board tacitly or explicitly wasted its resources by acting, as described above, in conduct which was condoned by each and all of Commerce's directors.

55.    Similarly, by so acting, Hill and each of Commerce's directors committed corporate waste.

56.    As a direct result of the foregoing, the Company has sustained and will continue to sustain serious damage, for which relief is sought herein.

## COUNT IV

## UNJUST ENRICHMENT

57.    Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

58.    By acting as described above, defendants have breached underlying duties and

have been unjustly enriched at the expense of Commerce and the Bank in an amount that cannot presently be determined by plaintiff. Including in such unjust enrichment have been the directors' fees paid by Commerce for their purported services rendered and to be rendered to Commerce which, as set forth herein, were provided haphazardly and inconsistently with sound corporate governance practices.

59.    The defendants have invested the proceeds of their unjust enrichment and realized earnings thereupon, all of which have been retained by them and by entities which they control.

## COUNT V

## BOOKS AND RECORDS

60.    Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

61.    On March 20, 2007, under and pursuant to §14A:5-28 of the New Jersey Business Corporation Law, plaintiff, through legal counsel, made a written demand on Commerce's Board of Directors and its Corporate Secretary to make available for examination and copying, 19 categories of Commerce's books and records bearing directly upon the wrongdoing alleged herein (the "Requested Documents") .

62.    Neither plaintiff nor his counsel received any substantive response to such request for books and records in more than three months. As such, such request must be deemed to have been rejected.

63.    Given plaintiff's entitlement to examine and inspect the Requested Documents and the rejection of such request, plaintiff asks the Court to require Commerce and its Board of Directors to produce the Requested Documents forthwith.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims, issues or factual disputes subject to trial by jury.

## PRAYER  FOR  RELIEF

**WHEREFORE**, plaintiff demands judgment as follows:

A.     Declaring the 2007 Proxy Statement null and void and ordering a new Annual Meeting of Shareholders or Special Meeting of Shareholders under the supervision of a Trustee or Special Master after the preparation and distribution of a replacement Proxy Statement prepared in compliance with all federal disclosure rules;

B.     A judgment finding that the defendants have violated their fiduciary and other duties to the Company and its shareholders and have wasted the Company's assets;

C.     A judgment against the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the breaches of fiduciary and other duties by each such defendant jointly and severally in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

D.     An Order requiring Commerce, in consultation with plaintiff's counsel and with the approval of the Court, to nominate sufficient numbers of independent directors so that such newly nominated directors constitute a majority of the Board;

E.     Orders requiring the development of appropriate Board oversight procedures and safeguards to protect against the repetition of the conduct described herein;

F.     An Order requiring defendants to account for their unjust enrichment at the expense of the Company and re-pay the amount thereof together with the earnings they have realized upon it;

G.     An Order requiring Commerce and its Board of Directors to produce the Requested Documents to plaintiff forthwith;

H.     An order awarding plaintiff the costs and disbursements incurred in this action, including reasonable allowances for plaintiff's attorneys' and experts' fees and expenses; and

I.       Granting such other or further relief as the Court may deem just and proper.


Dated:  July 17th , 2007
        Haddonfield, NJ                                s/ Michael DeBenedictis
                                                      Michael J. DeBenedictis (MD 8048)
                                                      DeBenedictis & DeBenedictis LLC
                                                      41 S. Haddon Ave.
                                                      Suite #5
                                                      Haddonfield NJ 08033
                                                      (856) 795-2101
                                                      *A Member of the Bar of this Court*
                                                      mjd@debenedictislaw.com

                                                      Ann Miller (AM 5463)
                                                      Ann Miller LLC
                                                      834 Chestnut Street, Suite 206
                                                      Philadelphia, PA 19107
                                                      (215) 238-0468
                                                      am@attorneyannmiller.com

                                                      Attorneys for Plaintiff